IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA; and STATE OF MONTANA, | CV 23-29-M-KLD |
| *ex rel.* MAX BAUER, JR. and ERIC BAUER, | |
| Plaintiffs, | ORDER |
| vs. | |
| ALLIED WASTE SERVICES OF NORTH AMERICA, LLC, [1] d/b/a REPUBLIC SERVICES OF MONTANA, | |
| Defendant. | |

Relators Max Bauer, Jr. and Eric Bauer (collectively "Relators") bring this qui tam action on behalf of the United States and the State of Montana alleging that Defendant Allied Waste Services of North America, LLC, d/b/a Republic Service of Montana ("Republic") misrepresented the products and services it provided and billed to the government in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq. and its state counterpart, the Montana False Claims Act ("MFCA"), Mont. Code Ann. § 17-8-401 et seq. This matter comes before the Court now on

---

[1] The case caption is hereby amended to accurately reflect that Allied Waste Services of North America is an LLC. (Doc. 31 at 7 n. 1).

1

Republic's Motion to Dismiss the Third Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 30). Republic's motion is granted for the reasons outlined below.

## I.   __Background__ [2]

Republic is a garbage and recycling collection and disposal business that is authorized by the Montana Public Service Commission ("PSC") to operate in Missoula County. (Doc. 29 at ¶ 3). Relators Max Bauer and his son Eric Bauer worked in the waste management industry for several decades and are former employees of Republic. Max began his career at City Disposal in Missoula in 1958. (Doc. 29 at ¶¶ 29, 31). Max then worked for Browning/Ferris Industries ("BFI") after it acquired City Disposal in 1979, and later for Allied Waste Services as its General Manager of Montana operations.  (Doc. 29 at ¶¶ 31, 32, 46). Allied Waste Services eventually merged with Republic, and in 2008 Max became Republic's General Manager in Montana. (Doc. 29 at ¶ 33). Max retired from Republic in 2016 and worked as an independent consultant for Republic from 2016 through 2020. (Doc. 29 at ¶¶ 35-36). Max's son Eric began working at BFI in 1991 and continued there for the next 25-plus years as the entity evolved and eventually became Republic. (Doc. 29 at ¶ 37). Eric left Republic at the end of 2020. (Doc. 29

---

[2]  Consistent with the Rule 12(b)(6) legal standard described below, the following facts are taken from the Third Amended Complaint (Doc. 29) and matters of public record that are subject to judicial notice. (Docs. 31-3; 35-1 at 5-21).

at ¶ 38).

Prior to mid-2022, Republic was the only solid waste collection and disposal business authorized by the PSC to operate in Missoula County. (Doc. 29 at ¶ 3). During that period, Republic's customers in Missoula County—including several federal and state governmental entities—had no choice but to engage the services of Republic if they required garbage collection services. (Doc. 29, at ¶¶ 39-44, 95). And because Republic only offers on-site recycling collection services to customers who also use Republic for garbage services, prior to mid-2022 its customers had no choice but to engage Republic's services if they wanted recycling services that were coordinated with garbage collection services. (Doc. 29 at ¶¶ 95, 101).

The services that Republic provides are based on volume, and it offers 1.5 yard, 2-yard, 3-yard, and 4-yard dumpsters in Missoula County. (Doc. 29 at ¶¶ 112-113). A significant majority of Republic's commercial customers in Missoula County—including the federal and state governments—have elected to use Republic's 3-yard ("3 YD") dumpsters. (Doc. 29 at ¶ 54). Many of Republic's 3 YD dumpsters do not in fact hold three cubic yards, however, and instead measure just slightly over 2.5 cubic yards. (Doc. 29 at ¶ 52). There is currently a mix of undersized and full-sized 3 YD dumpsters deployed to Republic's customers in Missoula County. (Doc. 29 at ¶ 61). For all 3 YD dumpsters, even those that are

undersized, Republic has a policy of imposing overage charges for overfilled dumpsters and paying bonuses to its garbage truck operators for each overage reported. (Doc. 29, at ¶¶ 62-72).

In December 2020, L&L Site Services, Inc., d/b/a Grizzly Disposal ("Grizzly"), applied with the PSC for a Class D Certificate of Public Convenience and Necessity, seeking authority to collect garbage in Missoula County. (Doc. 31-3 at 2). The PSC established a deadline to protest Grizzly's application and received a timely protest from Republic. (Doc. 31-3 at 2). Republic filed a motion to dismiss Grizzly's application, and Grizzly sought leave to amend. (Doc. 31-3 at 2). The parties briefed the issue, and after hearing oral argument the PSC granted Grizzly's motion to amend its application and denied Republic's motion to dismiss. (Doc. 31-3 at 2). The PSC then issued a scheduling order establishing deadlines for discovery and pre-hearing memoranda and setting a date for an evidentiary hearing. (Docs. 35-1; 31-3 at 2). The PSC held a five-day evidentiary hearing in October 2021, during which both Relators testified about Republic's undersized 3 YD dumpsters and its overage policies. (Docs. 31-3 at 2; 29 at ¶ 181).

On April 29, 2022, the PSC issued a Final Order granting Grizzly's application for a license to operate in Missoula County. (Doc. 31-3). Republic filed a petition for judicial review in the Montana First Judicial District Court, asking the court to reverse the PSC's order and remand the case with instructions to deny

Grizzly's application. (Doc. 35-1 at 12-13). The court denied Republic's petition and affirmed the PSC's findings of fact and conclusions of law in full. (Doc. 35-1 at 11-21).

In March 2023, Relators filed this qui tam action against Republic on behalf of the United States and the State of Montana. (Doc. 1). Relators amended their complaint as a matter of right in April 2023 (Doc. 2) and again with leave of court in early December 2024 (Doc. 14). On December 12, 2024, the United States filed a notice declining to intervene in the case.[3] (Doc. 15). Relators then served Republic with the Second Amended Complaint, and Republic moved to dismiss for failure to state a claim. (Docs. 19; 20). In response, Relators sought and obtained leave to amend their complaint for a third time. (Docs. 28; 29).

The Third Amended Complaint alleges four claims for relief. Counts 1 and 2 allege violations of the FCA, 31 U.S.C. § 3729(a)(1)(A) and (B). (Doc. 29 at ¶¶ 192-200). Counts 3 and 4 allege claims under the MFCA, Mont. Code Ann. § 17-8-403(1)(a) and (b). (Doc. 29 at ¶¶ 201-206). Republic moves to dismiss the Third Amended Complaint in its entirety for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).

---

[3] The State of Montana has not entered an appearance in the case and its position on Relators' claims is therefore unknown.

## II.   Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is proper under Rule 12(b)(6) when the complaint "either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013). The Court's standard of review under Rule 12(b)(6) is informed by Rule 8(a)(2), which requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). At this stage, the Court "take[s] all well-pleaded factual allegations in the complaint as true, construing them in the light most favorable to the nonmoving party." *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018) (citation omitted).

To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678-79 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint will survive a motion to dismiss if it alleges facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility

that a defendant has acted unlawfully." *Iqbal* (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955).

In addition to meeting the plausibility requirements of Rule 8(a), a qui tam action under the FCA must satisfy the more demanding pleading requirements of Rule 9(b), which applies to allegations of fraud or mistake. *United States v. Corinthian Colleges*, 655 F.3d 984, 991 (9th Cir. 2011). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake." Conclusory allegations of fraud are thus insufficient. *See Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001). To comply with Rule 9(b), a complaint must "identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018) (quoting *U.S. ex rel. Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)). Rule 9(b)'s heightened pleading standard ensures that allegations of fraud are "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee*, 236 F.3d at 1019.

In general, a court may not consider materials outside the complaint in

7

deciding a Rule 12(b)(6) motion. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). "There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201." *Khoja*, 899 F.3d at 998. Under the incorporation by reference doctrine, the court may consider a document referenced in the complaint if the document is central to the plaintiff's claim and no party questions the document's authenticity. *See Corinthian Colleges*, 655 F.3d at 999; *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). The court may take judicial notice of matters of public record, including documents filed in judicial or administrative proceedings. *See e.g. Reed-Bey v. Guo*, 2025 WL 2687478 at *2 (E.D. Cal. Sept. 19, 2025); *Rupert v. Bond*, 68 F.Supp.3d 1142, 1154 (N.D. Cal. 2014). Here, the Court may consider the PSC's orders (Docs. 31-3; 35-1 at 5-10) and the state court's order on Republic's petition for judicial review (Doc. 35-1 at 11-21) because they are matters of public record subject to judicial notice.

## III.    **Discussion**

The FCA imposes civil liability on "any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1). Private individuals, referred to as "relators" may bring suit on behalf of the United

States government against those who have violated the FCA. *Silbersher v. Valeant Pharmaceuticals Int'l, Inc.*, 89 F.4th 1154, 1158 (9th Cir. 2024). "If the government declines to proceed, the relator may prosecute the action and, if successful, recover up to thirty percent of the damages." *Silbersher*, 89 F.4th at 1158-59 (citing 31 U.S.C. §§ 3730(b)(4), (d)(2)).

The MFCA is modeled on, and largely mirrors, the FCA. (Doc. 31 at 11, citing Ch. 465, L. 2005 at 118 (Hearing on H.B. 146 before the Senate Judiciary Committee, 59th Legislature (March 9, 2005) (bill sponsor stating that the intention of the MFCA was "trying to repeat what the Federal government had done in their False Claims Act Law."))). Given the substantial similarity between the two acts, the parties agree that the Court can and should look to federal case law for guidance when interpreting the MFCA. (Docs. 31 at 11-12; 35 at 11-12); *see e.g. BNSF Ry. Co. v. Feit*, 281 P.3d 225, 228 (Mont. 2012) (looking to federal case law for guidance when interpreting state discrimination statute that was substantially identical to its federal counterpart); *Wittenbrock v. Sunovion Pharmaceuticals Inc.*, 2019 WL 4452977, at *3 n.1 (C.D. Cal. July 29, 2019) ("Because of the similarity between [the FCA and its state counterpart)], federal decisions are deemed persuasive authority in interpreting both state and federal provisions.") (citation omitted).

Here, Relators allege that the contracts and invoices Republic provides to its

governmental agency customers contain factually and materially false statements about the size of its 3 YD dumpsters, and Republic has thus billed the government for services it did not provide. (Doc. 29 at ¶ 193). Relators further allege that by invoicing the government for overages in situations that should not have been overages—or at least not as significant an overage as Republic represented— Republic misleadingly omitted critical facts in a way that materially misrepresented the services it actually provided to the government. (Doc. 29 at ¶ 194). Relators claim that in doing so, Republic knowingly presented false or fraudulent claims for payment or approval to the federal government, in violation of § 3729(a)(1)(A) of the FCA, and knowingly made or used false records or statements in support of those claims in violation of § 3729(a)(1)(B). (Doc. 29 at ¶¶ 192-200). Relators assert parallel state law claims under substantively identical provisions of the MFCA, Mont. Code Ann. § 17-8-403(1)(a) and (b). (Doc. 29 at ¶¶ 201-206).

Republic moves to dismiss on two grounds: first, that Relators' MFCA claims are precluded by the MFCA's public disclosure bar; and second, that their FCA and MFCA claims do not satisfy the heightened pleading standard of Rule 9(b). The Court addresses each argument in turn.

### A.    The MFCA's Public Disclosure Bar

The right to bring a qui tam action is not absolute. *United States ex rel.*

*Bennett v. Biotronik, Inc.*, 876 F.3d 1011, 1013 (9th Cir. 2017). The FCA contains

a series of "'bars' to suit" that "are intended to prevent 'parasitic' or

'opportunistic' *qui tam* actions," including a public disclosure bar. *United States v.*

*Allergan*, 46 F.4th 991, 993 (citing *Schindler Elevator Corp. v. United States ex*

*rel. Kirk*, 563 U.S. 401, 412-13 (2011)). As amended in 2010, the current version

of the FCA's public disclosure bar requires dismissal of an FCA claim, unless

opposed by the government, if:

> substantially the same allegations or transactions as alleged in the action or
> claim were publicly disclosed—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the
> Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal
> report, hearing, audit, or investigation; or;
>
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing
> the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2010). Before the 2010 amendments, the FCA's

"public disclosure bar was triggered if the *qui tam* action was based upon

information publicly disclosed in *any* 'criminal, civil, or administrative hearing.'"

*Silbersher*, 89 F.4th at 1160. The 2010 amendments narrowed the requirements for

triggering the public disclosure bar, which now specifies that a channel (i)

disclosure can occur only in a federal hearing in which the government or its agent

11

is party, and a channel (ii) disclosure can only be made in a federal report, hearing, audit, or investigation. *See Silbersher*, 89 F.4th at 1190.

Presumably because there have been no federal proceedings here, Republic does not invoke the FCA's public disclosure bar and instead moves only to dismiss Relators' MFCA claims based on the MFCA's public disclosure bar. Montana's version of the bar provides that a court shall dismiss an action unless the action is brought by:

> the person who is the original source of the information, if substantially the same allegations or transactions alleged in the action or claim were publicly disclosed in:
>
> (i) a criminal, civil, or administrative hearing in which the governmental entity or agent of the governmental entity is a party;
>
> (ii) a state legislative, state auditor, or other governmental entity report, hearing, audit or investigation; or
>
> (iii) the news media.

Mont. Code Ann. § 17-8-403(6)(a). Like the parties, the Court looks to Ninth Circuit FCA caselaw for guidance in determining whether the MFCA's public disclosure bar applies here.

Determining whether the FCA's public disclosure bar applies is a two-step process. *See e.g. United States ex rel. Guzman v. Insys Therapeutic, Inc.*, 2021 WL 4306020, at *3 (C.D. Cal. May 19, 2021); *U.S.A. ex rel. Calva v. Impac Secured Assets Corp.*, 2018 WL 6016152, at *3 (C.D. Cal. June 12, 2018). First, the court

determines whether there was a prior "public disclosure" of the allegations or transactions underlying the complaint through one of the FCA's enumerated channels. *Calva*, 2018 WL 6016152, at *3 (citing 31 U.S.C. § 3730(e)(4)(A)); *see also Guzman*, 2021 WL 4306020, at *3. Second, if there was a public disclosure, the court determines whether the relator is an "original source" of the information and therefore falls within the exception to the FCA's public disclosure bar. *Guzman*, 2018 WL 6016152, at *3 (citing 31 U.S.C. § 3730(e)(4)(A)); *see also Calva*, 2018 WL 6016152, at *3.

Because the MFCA's public disclosure bar is substantively similar to the FCA's and includes the original source exception, the Court applies the same analytical framework here. In doing so, the Court must first determine whether there was a public disclosure through one of the channels enumerated in MFCA and, if so, whether Relators qualify as an original source within the meaning of the statute.

### 1.    Public Disclosure

For the MFCA's public disclosure bar to apply, the complaint must present substantially the same allegations as those previously disclosed publicly in "(i) a criminal, civil, or administrative hearing in which the governmental entity or an agent of the governmental entity is a party; (ii) a state legislative, state auditor, or other governmental entity report, hearing, audit, or investigation; or (iii) the news

media." Mont. Code Ann. § 17-8-403(6)(a)(i)-(iii). Republic argues that information disclosed during the PSC proceeding—specifically the October 2021 hearing—qualifies as a public disclosure in a governmental entity hearing under channel (ii).

Republic begins with a premise that Relators do not dispute—the PSC is a "governmental entity" within the meaning of the MFCA and the October 2021 hearing was open to the public. *See* Mont. Code Ann. § 17-8-402(3)(a)-(c) (defining "governmental entity" as the state, a city, town, county, school district, tax or assessment district, or other political subdivision of the state, or a unit of the Montana university system). Republic contends that Relators publicly disclosed substantially the same fraud allegations that form the basis of the Third Amended Complaint during the PSC hearing in October 2021.

Republic cites excerpts from the hearing transcript reflecting that Relators testified about the size of Republic's dumpsters, including that customers were being charged for 3-yard dumpsters that were closer to 2.7 yards, and about Republic's overage policy. [4] (Doc. 31 at 17, citing Docs. 31-1; 31-2). Republic also points to the PSC's final order, which relied on Max Bauer's "uncontroverted

---

[4] The Court may take judicial notice of matters within the public record, such as excerpts from the certified transcript of the PSC hearing, without converting a Rule 12(b)(6) motion to one for summary judgment. *See Epona, LLC, et al. v. County of Ventura,* 2019 WL 4187393, at *3 n. 4 (C.D. Cal. Apr. 12, 2019) (taking judicial notice of a certified transcript of a county Board of Supervisors hearing).

testimony that [Republic] charges for 3-yard capacity commercial containers in Missoula County, but the containers only have a 2.7-yard capacity." (Doc. 31-3 at 13). The PSC's final order also cited Max Bauer's testimony about the history of Republic's overages in finding that "strict adherence to the new overage policy results in a windfall to Republic that is unfair to its customers." (Doc. 31-3 at 13). Because substantially the same fraud allegations that form the basis of the Third Amended Complaint were previously disclosed at the PSC hearing, Republic argues a public disclosure has occurred under channel (ii) of the MFCA as required for the public disclosure bar to apply.

Relators do not dispute that substantially the same fraud allegations in the Third Amended Complaint were publicly disclosed during the PSC hearing. In fact, they expressly allege that Republic's use of undersized dumpsters in Missoula County was disclosed during the PSC proceedings by way of Relators' testimony at the October 2021 hearing. (Doc. 29 at ¶¶ 180-181). Relators do, however, disagree with Republic's assertion that the information disclosed during the PSC hearing qualifies as a public disclosure under channel (ii) of the MFCA.

　　　　　　　　a.　　Whether the PSC hearing falls within one of the MFCA's enumerated channels

Relators contend that two recent Ninth Circuit FCA cases—*Allergan* and *Silbersher*—draw a bright line between channel (i) disclosures—which occur in adversarial proceedings—and channel (ii) disclosures—which occur in

investigative proceedings—and show why the PSC hearing does not fall within either channel.[5]

In *Allergan*, a patent attorney brought a qui tam action alleging that pharmaceutical manufacturers fraudulently obtained two drug patents, thereby preventing generic drug competitors from entering the market. *Allergan*, 46 F.4th at 993. The manufacturers argued that the relator's claims were precluded by the public disclosure bar because the claims were based on information that was publicly disclosed during the patent process. As described in *Allergan*, the patent process begins when an inventor applies to the United States Patent and Trademark Office ("PTO"). A patent examiner at the agency then conducts an initial patent examination (called a patent prosecution), which "is an *ex parte* administrative proceeding." *Allergan*, 46 F.4th at 994. If a patent application is rejected at this stage, the applicant may request further examination and may appeal a final rejection to the administrative judges of the Patent Trial and Appeal Board ("PTAB"). *Allergan*, 46 F.4th at 995. The applicant and examiner then submit briefs to the PTAB, which can hear oral argument, and if the PTAB upholds the examiner's rejection, the applicant may appeal to the Federal Circuit. *Allergan*, 46

---

[5] Channel (iii) applies to disclosures made in the "news media."  Mont. Code Ann. § 17-8-403(6)(a)(iii). The PSC proceeding does not fall within channel (iii) and neither party argues otherwise.

F.4th at 995. The manufacturers argued that a patent prosecution qualifies as an "other Federal … hearing" under channel (ii) of the public disclosure bar.

The Ninth Circuit agreed, concluding that all four nouns listed in channel (ii)—"report, hearing, audit, or investigation"—"apply to a fact-finding or investigatory process 'to *obtain* information,' and together indicate that Congress intended for prong (ii) to cover a wide array of investigatory processes." *Allergan*, 46 F.4th at 998 (cleaned up). The court distinguished channel (ii), which "is primarily concerned with proceedings to gain information," from channel (i), which focuses "on adversarial proceedings." Because the patent prosecutions at issue "were *ex parte* administrative hearings in which the government was not a party," the court concluded they fit comfortably under prong (ii). *Allergan*, 46 F.4th at 999. The court posited in dicta that when a patent application is rejected and the inventor appeals to the PTAB, "the appeal could fall under prong (i) but not prong (ii)," but did not reach issue.

The Ninth Circuit addressed the public disclosure bar again in *Silbersher*, a qui tam action in which the relator successfully challenged the validity of a drug patent in an inter partes review ("IPR"), and then brought a qui tam action against the drugmaker alleging that the now-invalidated patent had allowed the drugmaker to stifle competition and overcharge the government in violation of the FCA. *Silbersher*, 89 F.4th at 1162. As described in *Silbersher*, after a patent has been

granted, anyone can challenge its validity by petitioning the PTO to hold an IPR of the patent, which "is a trial-like proceeding conducted at the [PTAB], an adjudicatory branch of the PTO." *Silbersher*, 89 F.4th at 1161. "In an IPR proceeding, the person challenging the patent argues against the validity of the patent, and the patent owner defends it," while "[t]he PTAB presides as the adjudicator." *Silbersher*, 89 F.4th at 1161.

On appeal from a district court order dismissing the action based on the public disclosure bar, the Ninth Circuit addressed whether the IPR that invalidated the patent was a disclosure occurring within channel (i) or channel (ii) of the FCA. *Silbersher* 89 F.4th at 1165-66. The court reiterated *Allergan*'s conclusion that "[c]hannel (i) primarily involves adversarial proceedings that are adjudicated on the merits before a neutral tribunal or decisionmaker, whereas channel (ii) primarily involves federal investigatory proceedings." *Silbersher*, 89 F.4th at 1164.

*Silbersher* recognized that an "IPR presents many hallmarks of a channel (i) federal administrative hearing" because it is a hearing "in which evidence and argument are presented before a neutral tribunal that adjudicates the merits of a dispute about the patentability of an invention" and "is an adversarial proceeding between two or more parties to the litigation." *Silbersher*, 89 F.4th at 1165. "But because the government was not a 'party' to the IPR proceeding" concerning the patent at issue, the Ninth Circuit concluded that the proceeding "was not a channel

18

(i) disclosure." *Silbersher*, 89 F.4th at 1165. The court also rejected the drugmaker's contention that the IPR qualified under channel (ii) as an "other Federal…hearing" because "[t]he IPR's primary function was not investigative in the sense of conducting a 'fact-finding or investigatory process to obtain information." *Silbersher*, 89 F.4th at 1166 (quoting *Allergan*, 46 F.4th at 998). Rather, the IPR was "adjudicatory—its purpose was to render a decision between [the parties] as to the obviousness or novelty of the [patent] through a trial-like federal administrative hearing." *Silbersher*, 89 F.4th at 1166. The court explained that "an important demarcation between channel (i) and channel (ii) disclosures is whether the proceeding is *ex parte* or adversarial," and reasoned that "[t]o conclude that an adversarial, adjudicatory, federal administrative hearing before the PTAB in which the government was not a party nevertheless qualifies under channel (ii) as an 'other Federal…hearing' would render the government-as-a-party requirement in channel (i) a nullity." *Silbersher*, 89 F.4th at 1166.

Applying the Ninth Circuit's reasoning in *Allergan* and *Silbersher* here, Relators assert that the PSC proceeding was adversarial and adjudicatory because motions to dismiss were briefed and argued, the PSC issued a scheduling order establishing deadlines for discovery and pre-hearing memoranda, and the PSC held a five-day evidentiary hearing after which it issued a Final Order, which was appealable—and was in fact appealed by Republic—to the Montana First Judicial

District Court. Because the PSC proceeding was adversarial and adjudicatory rather than investigatory, Relators contend, it does not fall under channel (ii) of the MFCA. And because the State of Montana was not a party to the PSC proceedings, Relators argue channel (i) cannot apply either. Absent a qualifying public disclosure under one of the enumerated channels, Relators take the position that the MFCA's public disclosure bar does not apply.

Republic counters, and the Court agrees, that although the PSC hearing was conducted in the form of an adversary proceeding, its primary function was investigative, rather than adjudicatory, such that it falls under channel (ii). The PSC's investigative function is grounded in Montana law. The PSC has a statutory duty to supervise and regulate the operations of public utilities and common carriers, including common carriers that transport solid waste. Mont. Code. Ann. § 69-12-201. To carry out these functions, the PSC has the authority to "undertake" or "hold" investigations, inquiries, and hearings, Mont. Code Ann. § 69-12-206, to "conduct investigations and hear complaints," Mont. Code Ann. § 69-12-210, and to review Class D motor carrier applications like the one submitted by Grizzly seeking authorization to operate in Missoula County. *See* Mont. Code Ann. § 69-12-314.

Upon the filing of a Class D application, the PSC must provide notice of the application to any interested party, and if a protest is received, must in most cases

schedule a public hearing. Mont. Code Ann. § 69-12-321. In considering whether to grant a Class D motor carrier application, the PSC must determine whether "public convenience and necessity" require the authorization of the proposed services. *McGree Corp. v. Mont. PSC*, 438 P.3d 326, 328 (Mont. 2019). To make this determination, the PSC considers factors that are focused on the public interest, such as "whether the new operation or service will serve a useful public purpose" and "existing carriers 'can and will' serve that public purpose without the new operation or service." *McGree,* 438 P.3d at 330.

"The PSC is specifically *not* vested with judicial powers." *Williamson v. Mont. PSC*, 272 P.3d 71, 82 (Mont. 2012) (citing Mont. Code Ann. § 69-3-103(1)). Rather, as reflected in the agency's regulations, PSC proceedings "are investigative on the part of the commission, although they may be conducted in the form of adversary proceedings." *Williamson*, 272 P.3d at 83 (quoting Admin R. Mont. 38.2.302(1)).

In the case of a Class D motor carrier application, PSC proceedings are, in effect, an investigation into whether "public convenience and necessity" require the authorization of the proposed services. *See e.g.* Mont. Code. Ann § 69-12-321(3) (stating that the PSC can deny a Class D application "without a public hearing when the records of the commission demonstrate that the route or territory sought to be served by the applicant has previously been made the basis of *a public*

21

*investigation* and finding by the commission that public convenience and necessity do not require the propose motor carrier service") (italics added). Consistent with the statutory framework, the PSC proceeding on Grizzly's Class D application was—in the PSC's own words—"investigative on the part of the commission" even though it was conducted in the form of an adversary proceeding. (Doc. 31-3 at 4 (PSC Final Order citing *Williamson*, 272 P.3d at 83)).

The fact that the PSC proceeding was conducted in the form of an adversary hearing, and resulted in a final appealable order, does not alter its fundamental investigatory purpose, which distinguishes this case from *Silbersher*. Because the "primary function" of the IPR at issue in *Silbersher* was adjudicatory rather than investigative, the Ninth Circuit concluded it was not a channel (ii) proceeding. *Silbersher*, 89 F.4th at 1166. Here, unlike the IPR in *Silbersher*, the primary function of the PSC proceeding was investigative, in the sense that it was focused not on adjudicating the rights of the parties but rather on undertaking a fact-intensive inquiry into whether an additional Class D hauler in Missoula County would "serve a useful public purpose, responsive to the public demand or need," whether this public purpose could and would be served by Republic, and whether issuing Grizzly a Class D license would endanger or impair Republic's operations "contrary to the public interest." (Doc. 31-3, at 4). Also, unlike the government agency in *Silbersher*, the PSC's regulations and Final Order both state in no

uncertain terms that its proceedings are investigative, notwithstanding the fact that they may be adversarial in form. Admin R. Mont. 38.2.302; (Doc. 31-3 at 4). Because the PSC hearing at issue here was focused on assessing the public's interest in having an additional commercial hauler in Missoula County, rather than adjudicating a dispute between Grizzly and Republic, its primary function was investigative. The PSC hearing thus qualifies as a channel (ii) proceeding under the MFCA.

Even assuming the PSC proceeding falls under channel (ii), Relators argue the MFCA's public disclosure bar does not apply for two reasons. First, to the extent Republic asserts that filings on the PSC docket constitute public disclosures, Relators invoke the MFCA's exception for records produced pursuant to Montana's constitutional right to know provision. Second, to the extent Republic asserts that Relators made public disclosures during the PSC hearing, Relators argue they satisfy the MFCA's original source exception. The Court addresses these arguments in turn.

b.    <u>Whether the MFCA's exception for records produced pursuant to Montana's constitutional right to know provision applies</u>

The MFCA's public disclosure bar states that "[t]he production of a record pursuant to Article II, section 9, of the Montana constitution or 2-6-1003 is not a public disclosure for purposes of this section." Mont. Code Ann. § 17-8-403(6)(b).

Article II, section 9 of the Montana Constitution is titled "Right to know" and provides that "[n]o person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure." This constitutional provision imposes an "affirmative duty" on government agencies—including the PSC—to "make all of their records and proceedings available to public scrutiny." *Great Falls Tribune v. Montana Pub. Service Comm'n,* 82 P.3d 876, 886 (Mont. 2003). This provision is codified at Mont. Code Ann. § 2-6-1003(1), which provides that "every person has a right to examine and obtain a copy of any public information of this state." The PSC has implemented this mandate in its regulations, which provide that "[a]ll pleadings, petitions, applications, motions, communications, exhibits, or other documents shall become matters of public record as of the day and time of their filing," unless a protective order is issued, and require the PSC to "permit interested parties and members of the public to examine any such public record." Admin. R. Mont. 38.2.303(1).

Relators argue that because the PSC docket was public as a matter of law, any fraud-related allegations or information disclosed in the briefing, expert reports, or other filings in the PSC proceeding were necessarily produced pursuant to Article II, section 9 of the Montana Constitution or Mont. Code Ann. § 2-6-

24

1003, such that the disclosures are excepted from the MFCA's definition of a "public disclosure." But Relators do not point to any right to know request seeking documents from the PSC proceedings, and do not provide any legal authority for the proposition that documents filed and made public on the PSC docket were "produced pursuant" to Article II, section 9 of the Constitution or § 2-6-1003. Because any disclosures in the materials filed on the PSC docket were made by Grizzly—a non-public entity—as part of the PSC proceedings on Grizzly's Class D application, and not in response to a right to know request, Montana's "right to know" provisions do not apply. Consequently, Relators' argument that any disclosures made on the PSC public docket are excepted from the MFCA's definition of a "public disclosure" fails.

Accordingly, for the reasons explained above, the Court concludes that information disclosed by Relators during the PSC hearing qualifies as a public disclosure under channel (ii) of the MFCA. Having determined that the first prong of the public disclosure bar is thus satisfied, the Court turns to the second prong and considers whether Relators fall within the MFCA's original source exception.

### 2.    Original Source Exception

The FCA defines "original source" as "an individual who either (i) prior to a public disclosure under [one of the three enumerated channels] has voluntarily disclosed to the Government the information on which allegations or transactions

in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before the filing of an action under this section." 31 U.S.C. § 3730(e)(4)(B). Like the FCA, the MFCA defines an original source as an individual who:

> (i) prior to a public disclosure, voluntarily disclosed to the governmental entity the information on which the allegations or transactions in a claim are based; or

> (ii) has knowledge that is independent of and materially adds to the publicly disclosed allegations and transactions and voluntarily provided the information to the governmental entity before filing an action.

Mont. Code Ann. § 17-8-403(6)(c). Relators bear the burden of establishing that one of these two pathways to original source status is satisfied. *See United States ex rel. Solis v. Millennium Pharms., Inc.*, 445 F.Supp.3d 786, 795 (C.D. Cal. 2020).

Republic takes the position that Relators do not qualify as original sources under the MFCA because (1) they did not disclose their fraud allegations to the government prior to the October 2021 hearing, and (2) they have not materially added to the public disclosure.

> a.      Whether Relators disclosed their fraud allegations to the government prior to the October 2021 hearing

To qualify as original sources under subsection (i), Relators must have voluntarily disclosed the information on which the allegations or transactions in

their MFCA claims are based to the government "prior to the public disclosure" at the October 2021 PSC hearing. Mont. Code Ann. § 17-8-403(6)(c)(i). Relators argue they satisfy this requirement because "[b]y the time the hearing occurred, the Relators had already voluntarily made the disclosures to the PSC via the PSC docket." (Doc. 35 at 27). Although Relators do not specify which documents on the PSC docket they are referring to, they allege in their pleading that Republic's use of undersized dumpsters was disclosed in an expert report filed by Grizzly on the public PSC docket, and that the information in the expert report was premised on information they had provided to Grizzly. (Doc. 29 at ¶¶ 180-82).

Republic argues the information in this expert report was not sufficient to put the government on notice of fraud. As reflected in the report, a civil engineering firm was retained "to measure a trash collection receptacle in the field and determine its volume." (Doc. 37-2 at 8). The civil engineer who prepared the report performed a volumetric measurement of a dumpster located in the parking area of a commercial building in Missoula. (Doc. 37-2 at 8). He described the dumpster as "a steel, generally trapezoidal box painted blue, with Republic Services logo marked on the front," and without any "tags or markings to indicate… the purported container volume." (Doc. 37-2 at 8). The report includes a photograph of the dumpster and concludes that the interior volume of the container "equates to approximately 2.54 cubic yards." (Doc. 37-2 at 8, 10).

27

The MFCA imposes liability on any person who "knowingly" presents false or fraudulent claims for payment or approval to the government, or "knowingly" makes use uses false records or statement in support of those claims. Mont. Code Ann. § 17-8-403(1)(a), (b). Republic contends the expert report did not give the government notice of fraudulent activity because it simply states the volume of a Republic dumpster and does not allege that Republic knew its 3 YD dumpsters were undersized.  (Doc. 37 at 9). Because the report did not disclose sufficient information to put the government on notice of the alleged fraud, Republic contends, Relators have not shown that they disclosed the information on which their MFCA claims are based to the government "prior to the public disclosure" during the October 2021 PSC hearing.

The Court agrees that the expert report, standing alone, is not sufficient to establish that Relators disclosed the information on which allegations or transactions in their claims are based as required by Mont. Code Ann. § 17-8-403(6)(c)(i). Republic cites the standard for a public disclosure, which requires the relator to provide enough information to put the government on notice of the alleged fraud. (Doc. 37 at 9, citing *United States ex rel. Fryberger v. Kiewit Pacific Co.*, 41 F.Supp.3d 796, 803 (N.D. Cal. 2014)). A public disclosure need not contain every specific detail; "[i]f enough of the underlying facts making up the elements of fraud are disclosed, the [public disclosure] bar applies." *Amphastar*

*Pharmaceuticals Inc. v. Aventis Pharma SA*, 856 F.3d 696, 704 (9th Cir. 2017)

(superseded by statute on other grounds as stated in *Silbersher*).

To determine whether this standard is met, the Ninth Circuit has adopted the

following test:

> If X + Y = Z, Z represents the allegations of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed. X and Y inevitably stand for but two elements: a misrepresented state of facts and a true state of facts.

*Fryberger*, 41 F.Supp.3d at 804 (internal citations and quotations omitted). X,

which is the misrepresented state of affairs is always in the possession of the

government; "[i]t is the public disclosure of the true state of affairs, or Y, that adds

to X and creates the inference Z that fraud has occurred." *Fryberger*, 41 F.Supp.3d

at 804.

Here, X represents the 3 YD dumpsters that Republic provides to the state,

and Y is the allegation that the dumpsters are undersized, measuring approximately

2.5 cubic yards. The expert report calculates the volume of a Republic dumpster

but notes that the dumpster did not have any "tags or markings to indicate… the

purported container volume." (Doc. 37-2 at 8). A report stating the volume of a

single unlabeled dumpster, without more, did not provide enough information from

which the government could have inferred Z – that Republic knowingly billed the

government for services that it did not provide and knowingly misrepresented the

services it actually provided to the government. Relators disclosed the additional information necessary for the government to make that inference for the first time during their testimony at the PSC hearing. Because Relators have not shown that they disclosed fraud to the PSC "prior to the public" disclosure at the PSC hearing, they do not qualify as original sources under Mont. Code Ann. § 17-8-403(6)(c)(i).

But even accepting Relators' argument that they disclosed the information on which the allegations or transactions in their claims are based in the expert report—they still do not qualify as original sources under Mont. Code Ann. § 17-8-403(6)(c)(i) because the expert report would itself be a qualifying public disclosure.

For purposes of triggering the public disclosure bar, "allegations or transactions are disclosed if they can be found in the pleadings or other public filings." *Amphastar*, 856 F.3d at 703. The Ninth Circuit has defined a channel (ii) "hearing" as "a 'proceeding' that also 'encompasses publicly-filed documents' submitted as part of the proceeding." *Allergan*, 46 F.4th at 997 (quoting *Ambulance Ser., Inc. v. California*, 202 F.3d 1238, 1244 (9th Cir. 2000); *see also Silbersher,* 89 F.4th at 1165 (a public disclosure under channel (ii)'s "other Federal hearing" provision "also encompasses publicly-filed documents submitted as part of the proceeding") (quoting *Allergan*).

As addressed above, Relators contend that because the PSC docket was

30

public as a matter of law, allegations and information disclosed in documents filed on the PSC docket—including the expert report— are excepted from the MFCA's definition of a "public disclosure." If that were so, Relators' argument that they disclosed their fraud allegations "prior to the public disclosure" at the PSC hearing might have some traction. As discussed above, however, documents filed on the PSC docket are not excluded from the MFCA's definition of a public disclosure. Accordingly, even assuming Relators disclosed their fraud allegations in the expert report, and because channel (ii)'s "other Federal hearing" provision encompasses publicly-filed documents submitted as part of the proceeding, the expert report would itself be a qualifying public disclosure that is subject to the public disclosure bar.

Because Relators have not shown that they disclosed the information on which the allegations or transactions in their claims are based to the government "prior to the public disclosure," they do not qualify as original sources under Mont. Code Ann. § 17-8-403(6)(c)(i).

> b. <u>Whether Relators have materially added to the public disclosure</u>

The MFCA provides a second pathway to qualifying as an original source. Mont Code Ann. § 17-8-403(6)(c)(ii) provides that an original source is an individual "who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions and voluntarily provided the

information to the governmental entity before filing an action."

"Allegations do not materially add to public disclosures when they provide only background information and details relating to the alleged fraud—they must add value to what the government already knew." *United States ex rel. Hastings v. Wells Fargo Bank, NA, Inc.*, 656 Fed. App'x 328, 331-32 (9th Cir. 2016). "[E]ven 'independent' knowledge of allegedly fraudulent activity does not 'materially add' to publicly disclosed allegations unless it is 'qualitatively different' from information already discovered and not 'merely the product and outgrowth of publicly disclosed information.'" *United States ex rel. Hoggett v. Univ. of Phoeneix*, 2014 WL 3689764, at *9 (E.D. Cal. July 24, 2014) (citation omitted).

The Third Amended Complaint alleges that Relators have knowledge that is independent of and materially adds to the information disclosed during the PSC proceedings and voluntarily provided the information to the PSC before filing suit. (Doc. 29 at ¶ 190). Specifically, as to Max Bauer, Relators allege in that he: (1) has specific knowledge of Republic's undersized dumpsters, how Republic came into possession of them, and how Republic was aware of the actual size of the dumpsters; (2) has specific knowledge about how Republic bills customers for commercial garbage collection, including by negotiating and adjusting the number of lifts per week a customer might require; and (3) has provided additional information about his attempts to mitigate the impact of the undersized dumpsters,

32

and the overage policy Republic implemented in 2018. (Doc. 29 at ¶ 190(a)-(c)). Republic counters that Max disclosed the facts referenced in (1) during the PSC hearing, and argues that the billing, lift negotiation, and attempted mitigation referenced in (2) and (3) are not material to Relators' fraud claims.  Republic's position is supported by the record, and Relators do not argue otherwise in their response brief.

As to Eric Bauer, Relators allege that he has specific knowledge of: (1) Republic's use of the 3 YD dumpsters at various federally owned facilities throughout Missoula County and overages charged at those facilities; (2) Republic's refusal to let Grizzly use the Missoula Landfill; and (3) Republic's overage policy and its implementation, including identifying and billing for overages "where a customer might have [four] 3 YD dumpsters and two of them were loaded slightly over the two dumpsters next to them were half empty." (Doc. 29 at ¶ 190(d)-(g)). Republic counters that the use of undersized dumpsters at federal facilities referenced in (1) is not relevant to Relators' MFCA claims, the use of the Missoula landfill referenced in (2) is immaterial to Relators' claims that Republic billed for undersize dumpsters and improperly assessed overages, and the information about Republic's overage policy referenced in (3) was disclosed during the PSC hearing. (Doc. 31 at 25). Republic's position is supported by the record, and again, Relators do not argue otherwise in their response brief.

Relators have thus failed to demonstrate that they have independent knowledge that materially adds to the publicly disclosed allegations or transactions. Accordingly, Relators do not qualify as original sources under Mont Code Ann. § 17-8-403(6)(c)(ii). In sum, the Court concludes for the reasons explained above that information disclosed by Relators during the PSC hearing qualifies as a public disclosure under channel (ii) of the MFCA. Because Relators are not original sources, their MFCA claims are precluded by the public disclosure bar.

## B. Failure to State a Claim

### 1. FCA Claims

Republic next argues that Relators failed to plead all of the essential elements of their FCA claims. The elements of an FCA claim are: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Campie v. Gilead Sciences*, *Inc.*, 862 F.3d 890, 902 (9th Cir. 2017) (citing *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188 (2016)). Republic contends that Relators have failed to plausibly plead the materiality element of their FCA claims.

The FCA defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or

34

property." 31 U.S.C. § 3729(b)(4). "The materiality standard is demanding," and the FCA "is not 'an all-purpose antifraud statute' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 579 U.S. at 194. (internal citation omitted). Materiality considers "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193. "No single fact or occurrence" is necessarily determinative of materiality. *Winter ex rel. United States v. Gardens Regional Hospital and Med. Ctr.*, 953 F.3d 1108, 1121 (9th Cir. 2020) (citing *Escobar*, 579 U.S. at 191).

The United States Supreme Court has identified a number of factors that are relevant to materiality, including whether the alleged misrepresentation went to the essence of the bargain, or was minor or insubstantial. *Escobar*, 579 U.S. at 193-94. Whether the government "expressly identif[ied] a provision as a condition of payment" is also relevant, "but not automatically dispositive." *Escobar*, 579 U.S. at 194. "Under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193 (internal quotation marks and alterations omitted.). "[E]vidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" weighs in favor of materiality. *Escobar*, 579 U.S. at 195. Conversely, evidence that "the Government pays a

35

particular claim in full despite its actual knowledge that certain requirements were violated," is "very strong evidence that those requirements are not material." *Escobar*, 579 U.S. at 195. In the words of the Ninth Circuit: "For a false statement to be material, a plaintiff must plausibly allege that the … violations are 'so central' to the claims that the government 'would not have paid these claims had it known of these violations.'" *Winter,* 953 F.3d at 1121 (citing *Escobar*, 579 U.S. at 191).

Courts in the Ninth Circuit have interpreted *Escobar* as requiring district courts to consider three primary factors when evaluating materiality: (1) whether the government's payment was conditioned on compliance with the statutory, regulatory, or contractual requirement at issue; (2) the government's actions in response to the violation at issue or similar violations and; (3) the magnitude of the violation—whether it went to the essence of the bargain, or was minor or insubstantial. *United States ex rel. Bashir v. Boeing Co.*, 765 F.Supp.3d 1111, 1128 (W.D. Wash. 2025) (citing *United States es rel. Roe v. Stephens Inst.*, 909 F.3d 1012, 1020-22 (9th Cir. 2018); *United States ex rel. Mei Ling v. City of Los Angeles*, 389 F.Supp.3d 744, 753 (C.D. Cal. 2019) (citing *Rose*, 909 F.3d at 1020-22).

### a.      Condition of payment

Relators' FCA claims allege that "[t]he contracts, service agreements, and

36

invoices that Republic provides to the government contain specific statements and representations about the size of 'three-yard' dumpsters that were factually and materially false, because those contracts and invoices provided an incorrect description of the products and services provided. In other words, Republic billed—and continues to bill—the government for services it did not provide and overbilled for services that it did provide." (Doc. 29 at ¶ 193).

Although Relators allege that Republic's contracts and invoices represent that it will provide dumpsters with a volume of three cubic yards, they do not allege that the government required any certification about the precise size of its dumpsters, or that the provision of dumpsters with that specific volume was expressly identified as a condition of payment.

> b.   Government's actions

Republic argues Relators fail to adequately plead materiality because they do not allege that the government would have stopped paying Republic's invoices if it had known the actual volume of the 3 YD dumpsters, and do not allege that the federal government stopped paying Republic's invoices after Relators disclosed this information or that it plans to stop making payments in the future. (Doc. 31 at 28-29).

As Republic notes, more than three years have passed since Relators testified at the PSC proceeding, and nearly two years have passed since Relators

37

informed the federal government and filed this action, yet Relators do not allege that the federal government ever stopped paying Republic during this period. In fact, Relators acknowledge that even after they testified at the PSC hearing, after Grizzly's entry into the market in Missoula County, and even after the filing of this lawsuit, "Republic is still collecting garbage from the government Plaintiffs via its undersized dumpsters, and the government Plaintiffs are still paying Republic to do so." (Doc. 35 at 30). Relators do not allege the government was unaware during this period that some 3 YD dumpsters were undersized, and instead allege only that "[p]rior to the time Max testified about the actual size of Republic's 'three-yard' dumpsters [in October 2021], there was no way the government would have known about the true size of the dumpsters." (Doc. 31 at 29, citing Doc. 29 at ¶ 195). Relators do not allege that the government consistently refuses to pay similar claims or that the government would have stopped paying Republic's invoices prior to the public disclosure and concede that the government has continued to pay Republic's invoices even after acquiring actual knowledge that some its 3 YD dumpsters are undersized.

While the decision to continue making payments can be strong evidence of immateriality, it is not necessarily dispositive. The Ninth Circuit has recognized that the government may continue paying claims for reasons unrelated to the materiality of the defendant's false claims. *See Gilead*, 862 F.3d at 906; *see also*

38

*Bashir*, 765 F.Supp.3d at 1137 ("[C]ourts have recognized that a federal agency may decide not to suspend payment to a potentially liable FCA defendant for reasons unrelated to the materiality of the defendant's false claims.") (citing other cases including *United States ex. Rel. USN4U v. Wolf Creek Fed. Servs.*, 34 F.4th 507, 517 (6th Cir. 2022) ("There are a variety of factors unrelated to the materiality of the allegations that could cause the Government to continue contracting with a party after the Government become aware of the alleged fraud" such as a lack of other suppliers or other feasible options.). "Because continued payments are relevant only to the extent that they are probative of immateriality, the Government may still maintain an FCA claim if it can muster allegations, taken as true, that explain why continued payments are not probative of immateriality in the circumstances presented by a specific case." *Mei Ling*, 389 F.Supp.3d at 761 (citing *Gilead*, 862 F.3d at 906)).

To the extent Relators argue they have alleged facts showing that the government's decision to continue paying Republic's invoices is not probative of immateriality, the Court is not persuaded. Relators allege that federal and state governmental entities have initiatives and mandates to reduce municipal solid waste, increase recycling, and limit greenhouse gas emissions. (Doc. 29 at ¶¶ 76-89). They allege that Republic owns the Missoula landfill, which is the only landfill in Missoula County, and dumps the garbage it collects in Missoula County

at the Missoula landfill. (Doc. 29 at ¶¶ 96-97). Relators further allege that Republic refuses to let Grizzly empty its trucks at the Missoula landfill, which means Grizzly must drive loaded garbage trucks approximately 100 miles to Lewis and Clark County, where it dumps the garbage at a landfill in the area of Helena, Montana. (Doc. 29 at ¶¶ 99-100, 104). Additionally, because Republic only offers on-site recycling collection services to customers who also use Republic for garbage services, Relators allege, "if a Republic customer with garbage and recycling services switches to Grizzly Disposal for garbage collections, Republic will no longer provide recycling services to that customer." (Doc. 29 at ¶ 102).

Relators claim these policies place Republic's governmental entity customers in a difficult position. (Doc. 29 at ¶ 103). They allege that even if the government "Plaintiffs know or become aware of Republic's undersized dumpsters, they may choose not to switch companies because, whether as a matter of policy or preference, they cannot allow their garbage to driven over a hundred extra miles to be dumped in a landfill in Lewis and Clark County." (Doc. 29 at ¶ 104). Likewise, Relators allege, "as a matter of policy or preference, the same customers are obligated to continue using Republic if they want to continue their recycling programs." (Doc. 29 at ¶ 105). Relators claim that these governmental entities "do not have the luxury of simply refusing payment, which would jeopardize their ability to keep their garbage local, minimize greenhouse emissions

40

in the disposal of their garbage, and continue on-site recycling collection." (Doc. 29 at ¶ 107).

But as Republic persuasively argues, Relators' allegations about the possible reasons the government may have continued pay Republic's invoices are purely speculative. At most, Relators suggest a theoretically possible explanation for the government's conduct. However, Relators stop short of alleging that the government's recycling and sustainability policies are the actual reason they continue pay Republic's invoices. On the facts as alleged, that the government has continued paying Republic's invoices even after Relators disclosed Republic's use of undersized dumpsters is "very strong evidence" that the alleged violation is not material.

c.      Magnitude of the alleged violation

Again, the gravamen of Relators' FCA claims is that the contracts and invoices Republic provides to the government contain specific representations about the size of its dumpsters that are factually false, and that Republic has thus billed the government for services it did not provide and overbilled for services it did provide. (Doc. 29 at ¶ 193). Citing this portion of their pleading, Relators argue that "the volume of the dumpsters was necessarily material because it was the very basis of the bargain between the parties." (Doc. 35 at 28).

But Relators have not alleged facts, even on information and belief,

demonstrating that the government—which continues to pay Republic for its services—considered the precise interior volume of the Republic's dumpsters to be significant. Relators have thus failed to allege facts demonstrating that the precise volume of Republic's dumpsters went to the essence of the bargain between the parties.

Relators next argue they have adequately pled materiality because they allege that Republic's actions violate certain state and federal statutes. Specifically, Relators note that under Montana law, it is unlawful to commit deceptive business practices, which includes selling, offering, or delivering "less than the represented quantity of any commodity or service." Mont Code Ann. § 45-6-318(1)(b). Relators also cite the Federal Trade Commission Act, which prohibits "[u]nfair methods of competition in or affecting commerce[] and unfair or deceptive acts or practices in or affecting commerce…" 15 U.S.C. § 45(a)(1). (Doc. 35 at 28, citing Doc. 29 at ¶¶ 157-59). "The fact that Republic's actions plausibly violate state and federal laws," Relators contend, "shows that those violations are at least plausibly material to the government's decision to continue to pay Republic for garbage collection services." (Doc. 35 at 28-29, citing Doc. 29 at ¶ 160).

Relators do not cite any legal authority for the proposition that the burden of pleading materiality can be met by alleging violations of state and federal statutes. In fact, the Ninth Circuit and other courts have held that a statutory or regulatory

violation does not constitute a violation of the FCA. *See United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265 (9th Cir. 1996) ("It is not the case that any … violation of the regulations or law, or receipt of money from the government where one is not entitled to receive the money, automatically gives rise to a claim under the FCA."); *United States ex re.. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) ("[C]laims for services rendered in violation of a statute do not necessarily constitute false or fraudulent claims under the FCA."). Thus, the allegation that Republic violated a state or federal statute does not establish that the alleged violation went to the essence of the bargain or otherwise establish materiality.

Having considered the *Escobar* factors, the Court concludes for the reasons detailed above that Relators have failed to plead the materiality element of their FCA claims with the plausibility and particularity required by Rules 8 and 9(b).

### 2.     MFCA Claims

As addressed above, Relators' MFCA claims are barred by the public disclosure doctrine. But even if the public disclosure bar did not apply, Republic argues Relators fail to state a claim under the MFCA for the same reasons they fail to state a claim under FCA.

Because the MFCA mirrors the FCA and there is no authority interpreting the materiality element of an MFCA claim, federal caselaw guides the analysis.

Like the FCA, the MFCA defines "material" to mean "having a natural tendency to influence or be capable of influencing the payment or request of money, property, or services." Mont. Code Ann. § 17-8-402(5). Applying the *Escobar* factors identified above, Relators fail to plead the materiality element of their MFCA claims for all the same reasons they fail to plead materiality under FCA.  They do not allege facts showing that the state government identified dumpster size as an express condition of payment, or that the precise size of the dumpsters went to the essence of the bargain between the parties. Relators also do not allege that the state government: consistently refuses to pay similar claims; stopped paying Republic's invoices after public disclosure of the undersized dumpsters; had no actual knowledge of the size of Republic's dumpsters after the information was publicly disclosed; or that it would have stopped paying Republic's invoices had it known the actual volume of the 3 YD dumpsters. Because they have not plausibly alleged materiality, Relators fail to state a claim for relief under the MFCA.

## V.    Conclusion

For the reasons discussed above,

**IT IS ORDERED** that Republic's Motion to Dismiss the Third Amended Complaint for failure to state a claim upon which relief can be granted pursuant to

//

//

Federal Rule of Civil Procedure 12(b)(6) (Doc. 30) is GRANTED and this case is

dismissed.

DATED this 11th day of May, 2026.

_____
Kathleen L. DeSoto
United States Magistrate Judge